Johansson-Grossby played by the rules here. There are four requirements to change status in the United States under H.C.F.R. 248. One, you have to be in a valid nonimmigrant status, which he was. He was on a B-2 tourist visa. Did he apply to change his status from B-2 to H-1B on a timely basis? He did. Did he maintain his status as a B-2 up until the time of filing? He did. Was he eligible for the applied for visa, the H-1B that was sought? Yes. So he was on a B-2 tourist visa. So he met the requirements, the explicit requirements of H.C.F.R. 248. How did he maintain his status? Because the regulation discusses that the regulation is focused exclusively on up until the time of filing. We have two cases really that govern this issue. Your position is if you file while you're still okay, that stops the process right now and you have maintained your status? That's what the regulation states on its face. Yes, Your Honor. Well, I think it's an awfully hard interpretation. Now, I have the regulation in front of me, 248.1, A in forens and B in forens, which says the change of status may not be improved for an alien who failed to maintain the previously accorded status. All who say this expired before the application or petition was filed. Maintain seems to me to keep in, to preserve. Your Honor, the key language that I see it is here is before the application or petition was filed. What we have here is the government promulgated an internal memorandum of understanding. We have an internal memorandum back on August 19, 1998, the Pearson memo, which addresses this issue specifically to only those people applying to change status to H-1Bs. What the Pearson memo states is that not only do you have to maintain your status up until the time you file to change, not only do you have to do so on a timely basis, but you have to do so up until the October 1 start-up date. Well, you point out there are problems with that Pearson letter. But let's forget it for a minute. Just the plain wording of the regulation says maintain. And you say, well, maintain doesn't really mean maintain. The regulation says maintain up, you know, before the application, you know, or before the application was filed. No, no, failed to maintain. It says it won't be approved. There's a difference between when you can apply and what happens when it comes time to approve, when either the visa becomes available or the decision is to be made. And the second part says, the first part is when you can apply, and the second part is, okay, now we take a look at approval. And if you're not in a maintained status at that point, you don't get it. I mean, there's two different parts, application and approval. Well, here's the issue with the H-1Bs. There are only limited numbers of H-1Bs because Congress has sought to reduce the numbers to 65,000 a year. So what happens is that on April 1, six months before you can apply, six months before the federal fiscal year, October 1, you're receiving, this last year, for example, we had 133,000 applications. So what's happened is that people, there's very reduced numbers of H-1Bs, and ultimately only 65,000 per fiscal year are accepted. That being said, when somebody comes here from another country and they're looking at this regulation, they're reading it as stating, okay, to be eligible, I have to file on a timely basis, I have to maintain my status up until the time of filing, and certainly it's reasonable to assume that they're not out there working illegally or committing crimes or doing anything wrong up until the October 1 start-up date. You're making a good sort of a policy argument, but the problem is that wording says if your status hasn't been maintained and it comes time to approve it, which means either the visas become available or the decision is made, if you're not in a maintained status, you've got to go back and start over again. We're only going to approve these for people who are in a maintained status. You're trying to read it as so long as you timely apply, you don't have to maintain. That's the way you want us to read it. Based on the express wording of this regulation, yes, it says who failed to maintain the previously accorded status or whose status expired before the application or petition was filed. I have no problem with the government, and under Chevron deference, they will certainly get their way, coming up with a standard specifically applicable to H-1Bs and stating, look, in addition to this regulation, we're going to hold that if your I-94 arrival departure card expires before October 1, we're not going to hold that you have maintained your status. And that was the second basis of my argument. And I think, quite frankly, that could be viewed as a reasonable interpretation. What's the purpose of waiting until the last second to apply? Is somebody trying to game the system by doing that? I don't think so. It could be, for example, somebody's here as a tourist, and they're offered a job close to the time when they have to leave the country. They look at the express wording of the regulation, and they say, well, okay, I've filed on a timely basis. I've maintained my status up until the time of filing. I should be okay until I can start working. Well, you know, it's hard to believe that the beneficiary is going to do the reading. These companies have lawyers. The lawyer reads the statute, reads the regulation, and advises the company, no doubt, as to whether. And it seems to me essentially saying Congress should grant more of these. I agree with you. I think it would be a great idea. But it hasn't. There are a limited number, and the access to them is pretty restricted. I mean, it's too bad. You're absolutely right. But that's the way Congress has chosen to write the law. Can I ask you this question? Now, could he have returned to the Philippines and then come back on October 1, 2004 and get his H-1B visa renewed? He could have returned to the Philippines. He could have applied for the visa at the U.S. Embassy in the Philippines, where it either would have been approved or disapproved. Quite frankly, it's a crapshoot when you deal with U.S. embassies. Oh, I see. So he doesn't. I thought maybe he might get it here, but he'd have to go back just as a matter of form, go back and then wait until October. Wait a second. October the 1st. And I forget. There's no guarantee of the visa when you apply for it at the U.S. Embassy. My time is limited, but I'd like to. Well, let me ask one more question. I was trying to figure out why people might do this, and it seems to me that this might be a way to get first in line for the next batch. The people applying first in line nowadays are applying on April 1. In other words, before these things become available, it's a way to try to become first in line for the available petitions by waiting until the last second. And if we were to adapt your construction, we would say, okay, there he is. He's spring-loaded and ready to go. He's first in line or in the first group. So it's a way of maximizing the potential for getting one of these things. It's like jumping the line. You could be outside the United States and sponsored for an H-1B just as readily. You don't have to be physically in the United States to be eligible. Are your chances of getting the visa enhanced if you're first in line? I would say yes. That's the way they work. Yes, if you've applied on April 1 nowadays, and there's no guarantee on April 1 you'll even get the visa. It's a lottery. It's a lottery. So why did you say if you're the first one to apply, you're going to get it? You're not. It's a lottery. There's no guarantees. Well, there's no guarantees, but you get them in the order in which you've applied. Correct. Correct. Yes. So the earlier you get on the list, the greater the opportunity that you're going to get one. Well, now it's April 1 or nothing. If you don't get it on April 1, you can't apply on April 2. The quota would have run out by then. It seems to me that this is a way of getting in before April 1. I don't know that it is necessarily because, again, anybody can apply. Is it okay to continue because my time was up? Could he have applied on April 1? This was done a few years ago. I don't remember what the quota was back then, but it's to the point now where on April 1 you're getting 133,000 applications for 65,000 visas. And people are applying for them all over the world, whether they're here in the U.S. or outside the U.S. So they're just going to basically take the first 65,000, huh? Well, they'll get 133,000 and they'll sift through them, and then on a lottery basis they'll find 65,000 and the others are returned. What do you mean? So you told me two different things. I mean that first come, first serve, or you toss in that full – you get in line as long as you're in that first hundred and how many thousand? 133,000. Somehow you make it to 133,000, then they're going to sift through it, and then you're in the lottery. That's right. So you don't get – he's not in the lottery, or is he in the lottery? No, no. His age was applied for prior to this year, so I'm just pointing out the high demand for H-1Bs. You have given two inconsistent answers. Is it first come, first serve, or is it a lottery? Back when he applied, I don't remember when the quota date was reached, but at that time I think it was first come, first serve. First come, first serve, they get in a line of whatever the number is, 130,000. Then after they get the 130,000 applications, then the curtain closes. And then they sift through them, and they throw some out, and then they have a lottery with what's left. Is that the way it works? Well, I'll take this year, for example. On April 1, there were 133,000 H-1Bs filed with the USCIS. And these were applied for whether it was in the context of change of statuses, like this case, or the applicants could be outside the United States. What the agency then did was because the congressionally imposed cap was 65,000, it in essence returned 68,000 of the applications to the companies that had sponsored them. Okay, so the first numbers that meet that allotment, they get into the lottery. Anybody who comes after that doesn't get into the lottery. Well, this year, on April 1, which is the first day that you could apply for H-1Bs, the quota was filled. I mean, and then some, by more than twice as many applications as visas that were available. So if you applied on April 2, and thereafter, for sure, your application would never be considered. If you applied on April 1, six months before the start-up date, at the very earliest possible time, you had a less than 50% shot of even having your application considered. And that's what happened this year. Okay, thanks. Thank you. Good morning, Your Honors. May it please the Court. We don't sell those lottery tickets, do we? Not yet, Your Honor. We could, yeah. May it please the Court. My name is Carla Ford. I'm an assistant U.S. attorney, and I represent the government agencies in this appeal. First, to inform the Court and correct the record, I'd like to answer some of the questions that were just posed to appellants' counsel. First, in the particular case we have before us, the H-1B visas ran out in February 2004. At that time, it had reached the 65,000-person cap, and there were no more H-1B visas available. Mr. Grosbe filed an application for petition as a specialty worker through the company L.A. Closeout on April 5, 2004, which happened to also be the last day Mr. Grosbe's B-2 visa was in effect. After that day, it was expiring. From the time of the application until the decision was approximately three months to July 2004. At that time, CIS issued a decision, in one instance, granting the change of classification for Mr. Grosbe from B-2 visitor to H-1B specialty worker. But it was a mixed decision. The decision also was that Mr. Grosbe's application for change of status was denied because he failed to demonstrate to the agency he was going to be able to maintain his status as a non-immigrant up through the time of the first day of the H-1B visa being effective and the first day of his job, which would have been October 1, 2004. There was a gap between April 6, 2004 and October 1, 2004. CIS sent a request for evidence to L.A. Closeout and Mr. Grosbe saying, show us how you're going to maintain your status, Mr. Grosbe, until October 1, 2004. No evidence was given, and so the agency had no choice but to deny the application for change of status, which is a different decision from granting the change of classification. Now, Judge Trott had a question about whether Mr. Grosbe, by having gotten the change of status denied, had to then go back and start all over again. The answer to that question is no. Mr. Grosbe was ahead of anybody who was going to be in line first as of April 1st when more applications could be taken for the H-1B visas for the new fiscal year in October because he got an H-1B classification approval. That put him toward the front of the line such that when he presented that piece of paper to the consulate in Manila, he was going to get a visa, an H-1B visa, because he had the classification in hand. Barring any other failure to meet any other criteria for that, Mr. Grosbe was going to get his H-1B visa. All he had to do was go back to the Philippines and wait for those few months for October, then present it to the consulate. You've explained this very clearly, but I don't quite get what the point is. If he's given the H-1B visa, then it seems like, I don't quite understand, but you've got to go to Manila, you know, and then you can come back. Well, I'll answer that, Your Honor. The reason for that is because he had a visa that expired on April, at the end of April 5th, 2004. Non-immigrants and immigrants who come to the United States are coming under conditions. As a B-2 visitor, Mr. Grosbe was coming as a tourist, saying, I'm going to be coming here to the United States for six months, that has been authorized, and at the end of that time, I'm going to go back home. He didn't come in as a specialty worker or in some other capacity, saying, I'm here to look for a job, and I don't want to go back until I've gotten my job. And the trick here is you asked him to submit information to show that he could maintain his status, and nothing came. That's exactly right. What might he have been able to show in order to be able to stay here? Well, it's interesting. Mr. Grosbe could have asked for an extension of his B-2 status, apart from asking to become a specialty worker. And I need to explain that, because when you're a B-2 visitor, you're warranting to the Attorney General that I'm a tourist and I'm not going to abandon my home and I'm only going to be here for up to six months, because that's the time that's allotted for tourists in this country. If he had, without filing for a change of his work classification, said, I'd like to stay for another six months, he could have applied for a six-month extension, and in all likelihood it would have been granted, because there would have been nothing else in the record to indicate that he had any other purpose for being here except to be a tourist. What Mr. Grosbe did, however, and it's to his credit, I think it shows that he wasn't trying to game the system necessarily, but he's here on vacation, he gets offered a job, and he knows he's got to adjust his status to a different classification in order to do that. His company filed an H-1B visa application. The problem is he was never going to be able to extend his B-2 visitor status at that point, because he would have had to swear that he was going to stay as a tourist, when in fact he really means to continue staying somewhere. And that would have been a false representation. A false representation. And so really what this is about, Your Honors, is convenience. Mr. Grosbe would prefer not to have to go back to the Philippines, and he hasn't as far as the record demonstrates. He's still here as far as we know. But he's here out of status because at the end of April 5, 2004, he no longer was in status. So practically speaking, where are we when we rule in this case? What happens? What happens is Mr. Grosbe is here out of status. He's here out of status in any event, Your Honor, but he needs to return to the Philippines. I don't know whatever happened with this job. I hope he wasn't working at the company because if he did, he would be violating the law and he would probably be inadmissible under some aspect of the Immigration Naturalization Act. And he needs to go back to the Philippines, and if he'd like to return, he's going to have to wait, but he's going to have to wait for 10 years now. He's going to have to what? He's going to have to wait because he's going to be barred by having overstayed his visa. He's going to be barred for 10 years? That's right, Your Honor. Because he overstayed his visa. That's right. Well, not just because he overstayed his visa. It's a two-tier system, and actually this gives me the opportunity to explain the grace period because I think that's an important consideration. The fact that Mr. Grosbe filed for his H-1B visa on the last day that his B-2 visa was valid was not inappropriate. He was allowed to do that. There is a code section that allows for a 120-day grace period, and that is under 8 U.S.C. Section 1182A9B4. And what does that mean, you have a 120-day grace period? It means that even though Mr. Grosbe was out of status at the end of April 5, 2004, he began a 120-day grace period during which he could stay in the United States without accruing unlawful presence vis-à-vis his H-1B visa application because at that time it was pending. Three months later, when he gets a ruling, he's still within that 120-day grace period, and he's told you can change your classification, but you're out of status, you're going to have to go home because you've been unable to show us how you're going to maintain status until October 2004. So he was shy how many months then? That was three months. He had a four-month grace period, so he had a whole month left when he got the decision about his classification. A whole-month grace period. No, no, no. The grace period is 120 days, approximately four months. Right. And by the time the application was decided upon in July, Mr. Grosbe still had about another month to either remain in the United States, but actually he should have left. A month of his grace period. A month of his grace period. He should have left. And if he had done that, then he could have gone back to the Philippines and come back in October to start his job because he would have been able to get a visa from the consulate in Manila. And he knew that, huh? Well, it's a matter of statute, Your Honor, and we're all on notice about it. Well, he was also represented by counsel, Your Honor. He was represented by Mr. Chernick. And so the fact that these statutes are in existence and available for Mr. Chernick to use on behalf of Mr. Grosbe and L.A. Closeout as he has means he's also responsible for knowing what the other statutes are and what their effects are going to be. So he could have stayed here for 120 days. Without accruing unlawful presence. Without presence and gone back to the Philippines, spent another month there, huh? Yes, he could have. Spent another month in the Philippines to pick up his visa. Show up with his HB-1, pick it up, and come back. That's right. And that's what he chose not to do. Basically, he's asking this Court, Your Honors, to ratify his decision not to follow the rules and the laws in this instance. Do you do this work all the time? No, I don't, Your Honor. It's part of my practice. It's one part. You sound like an expert. I've become one. Good for you. We've got so many government people sort of on detail who come in who have never seen anything like this before, and you start asking them to explain the system or how it works, and their eyes cross. So it's nice to have somebody who seems to have a familiarity with the way the whole thing works. Well, thank you. I would like to say to that, Your Honors, that I have quite a bit of support from our agency counsel, two of whom are present with us this morning. Who's there? Pilar Luna and Sheila Fisher. Do they work for you? No, no, Your Honor. They are my client. They work for Citizenship and Immigration Services. Where is your regular spot in justice? I'm a line AUSA in Los Angeles downtown. You're a what? I'm a line assistant U.S. attorney. That is, I'm just another of U.S. attorneys. Oh, you work in the civil division. That's right, Your Honor. You're kind of like an MVP to be able to pick this up. Thank you, Your Honor. I won't say which one, but some of your colleagues did more testifying from the back bench there than the lawyers did in the front of the podium, you know, because they go like this. I wasn't sure whether they were members of the petitioner's family or not. So anyway. Well, thank you. On that basis. You did a great job. Thank you. If there's nothing further, we submit, Your Honor. So how long did it take you to learn all this? What time? All right. A little while. Thank you. Okay. Mr. Turner? Let me ask you, do you know this guy? He'll stay here another 120 days and just go back to the Philippines, spend a month there, see his friends, take his, what's it called, H-1B? Approval. Approval. So long. How do I explain this? If there was a guarantee, an assurance that a person would just go back to their country of origin, pick up their visa, get their passport annotated with the H-1B at the U.S. Embassy and come right back, I don't think we would really be here. Is that a way of saying you knew it and you decided because there was no guarantee that you counseled against it? I spoke to Mr. Grosbeck. I have had some clients. Well, my job is to explain the law to individuals, and at that juncture, there's a decision. Some will go back to their country of origin and take their chances, and at that point some will get the visas and some won't. And some will stay here and take their chances. Others, like Mr. Grosbeck, said, I want to take the shot that I believe, you know, and we went through the regulation that the HCFR 248 focuses on maintenance of status and filing up until, you know, the date that the I-94 expires, and that, as a result, the interpretation was that he would be allowed to remain here up through the October 1 start-up date, as long as he didn't violate his status. Counsel for the government just said, well, I have to go back there. And on this date, whatever it was, October 1, he just knocks on the door of the American Embassy and give me my H-1B, yeah. Your Honor, I've been practicing immigration law since 1986. I've seen, you know, the vicissitudes, good and bad, and it's just not that easy that you can go to the U.S. Embassy and get your passport annotated. Well, I know that we have a history of the U.S. Embassy in Manila double-crossing Philippines, Filipinos, especially the scouts in the Second World War, because what we did was we withdrew the counsel, and there was no place they could go to get their citizenship. But we're paying the price for it, and we're getting close to correcting it. A lot of those guys are not around anymore. But, I mean, are you saying that what counsel for the government just told us is maybe, you know, that's what the law is? But when you go to the Philippines, they, you know, you're in Dodge and you never know what you're going to. There's no counselor reviewability. There's no mechanism to review a decision. That may be erroneous. The counselor officials at U.S. Embassy posts worldwide have carte blanche authority to either approve or deny visas. And there is no mechanism to challenge it in a court. There's no guarantees so that if people go back to whatever country it might be and the U.S. consulate officer for whatever reason decides, I'm not going to annotate this pass, I don't agree with this decision. There's plenty of cases where they have gone beyond a U.S. CIS decision and made their own decision in a case that they might not have agreed with the agency and for whatever reason opted not to annotate a passport. So because of this question, there are people who decided we're going to challenge this regulation and take our chances. I mean, certainly I get the feeling that the court is not going to probably render in favor of Mr. Grosbeck and there certainly is going to be a very... You called up the embassy in Manila and asked to speak to the ambassador, someone there, to find out, well, if he goes back, be there a month, is he going to get it? Your Honor, you can't even, oftentimes you can't even reach a counsel, let alone, I mean, an ambassador. Why could you not belt and suspend this, send him back and challenge it at the same time? And then if somebody in Manila screwed up, you'd still have your challenge going. Couldn't you preserve both opportunities? I don't think you can. When he physically departs the country, that's it. He's in the hands of the State Department and there is no court reviewability of counselor matters. That's the crux of the issue. Why could you not have pursued exactly what you're here on today with your client in the Philippines? And then you could have mooted this out had the visa been approved. Because once he's departed from the United States, I don't think he could be pursuing this action here. And ultimately, the decision, when you depart the United States, there are many instances of people with H-1B approval notices and they bring them to the embassy and they present them, here you go, here's my approval notice. And the embassies or consulates are not bound by these USCIS decisions entirely. I mean, they'll review the paperwork and if they, for whatever reason, if they find that there's something in it they don't like, they can send it back to the administrative agency for revocation. I didn't understand that. I didn't understand it because I've been to those embassies and I've seen the way they treat people. And I was in there with my daughter when she was 12 years old and she was appalled. And she started to yell at this embassy employee for the way he treated this very elderly woman. And she's been yelling at people ever since. But that's a true story. But so you're saying that the Justice Department's got no control over the State Department. That's correct. I mean, there is a mechanism through Washington. You can try to do it informally through the State Department of Appeals Division. But in the meanwhile, somebody is stuck outside the United States. The wheels of justice turn very slowly. And if you even get a response. So what happened in these cases is we wanted clarity on the regulation. If the Ninth Circuit isn't going to find, you know, in favor here. I mean, certainly it's very clear to me that anyone whose I-94 expires before October 1 is going to have to go back to the U.S. Embassy and take their chances. Where's your client now and what's your client doing? He's in Los Angeles. Is he working in this job? I don't ask, quite frankly. Don't ask, don't tell. Look, quite honestly and quite frankly, he has to support himself. I mean, I'm not going to put blinders on. I'm sure he's having to do something to support himself here. You know, I don't know how else to answer that. But I mean, the issue really, and quite honestly, if this is going to be denied, and obviously then there will be a lot more clarity in this area, but what happens to people applying for other visas? If you come in on a tourist and you're offered a job as an L-1 intercompany transferee or an E-Treaty investor, I mean, basically nobody is going to be allowed to change status because what typically happens is you come in on a tourist visa, you're allotted a certain period of time. If you apply before, the visa expires from a practical standpoint, and I'm only talking as an immigration practitioner. When you apply to change status, your clients are just waiting around for the decision on the change of status application. And so the concern is that really no cases are going to be able, I mean, really, I'm going to have to advise everybody, don't apply for change of status. Don't wait around. If your I-94 is going to expire, then apply for it back at your country of origin and take your chances. And if they don't give it to you, too bad, you can't appeal it. And that's the end result. And that's the area of concern. It's a stupid way of doing things, but it depends on the United States Congress to change it. We never had a cap on H-1Bs until some years ago. This would have never been an issue until they imposed a real limited number of H-1Bs. Why did they put a cap on? I think there were concerns, maybe from labor organizations or what have you, that people were taking jobs away from Americans. I think that labor convinced Congress to reduce the numbers. I mean, we used to have twice as many numbers. We never had these issues because we never had such limited numbers of visas. But now what's happened is, and I believe we're going to start to feel the effects, what's happened is we have people here going to college, getting bachelor's, master's degrees on F-1 student visas. They're getting degrees in sciences, in research, in computers, areas that, quite frankly, there are shortages as of now in this country. That's the tension. Companies are saying we need people to do this work and we can't find them here. And on the other side you have labor saying, look, we're already outsourcing most of our jobs to foreign countries and now we're going to let foreigners come here and get jobs. That's the tension. That's the tension. And Congress has to figure out where the happy medium is. But in the meantime, these U.S.-educated foreign students are not getting their H-1B visa numbers because of the restrictive limitations, and they're going elsewhere. Congress made a decision. You might be right. Well, let me ask the question. Let's say that there's no way that the Department of Homeland Security could have said to your client if Homeland Security was in existence there, okay, you're a visitor, you've got that 120-day grace period, so you've got to get out of here. And here's a little note that says, from us to people in the embassy in the Philippines, give this guy his H-1B. Absolutely not. You can't do that. They're not bound by these decisions. Well, Homeland Security covers a lot of different agencies and departments. And the executive branch doesn't cover the issuance of visas by consular officials. No, it doesn't. So it's a separate adjudication. And for whatever reason, they could choose to deny it. I've had some situations where the State Department has not annotated the H-1B, and the applicant or the company has tried writing letters and requesting information, and it's just sat there. And this is with an approved H-1B. This is with an allocated H-1B visa. Well, I think we have got the story. Thank you. Okay, thanks. All right. Goldie v. Hartford Insurance.
judges: Pregerson, Noonan, Trott